GREGORY C. LOARIE (CA Bar No. 215859)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2000
Fax: (415) 217-2040
E-mail: gloarie@earthjustice.org

ELIZABETH B. FORSYTH (CA Bar No. 288311)
EARTHJUSTICE
800 Wilshire Blvd., Suite 1000
Los Angeles, CA 90017
Tel: (415) 217-2000
Fax: (415) 217-2040
E-mail: eforsyth@earthjustice.org

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, ENVIRONMENTAL PROTECTION INFORMATION CENTER, KLAMATH-SISKIYOU WILDLANDS CENTER, and SIERRA FOREST LEGACY,<br><br>   Plaintiffs,<br><br>  vs.<br><br>U.S. FISH & WILDLIFE SERVICE, *et al.*,<br><br>   Defendants,<br><br>  and<br><br>AM. FOREST RESOURCE COUNCIL, *et al.*,<br><br>   Defendant-Intervenors. | Case No.: 3:16-cv-06040-WHA<br><br>**PLAINTIFFS' NOTICE OF MOTION**<br><br>**and**<br><br>**MOTION FOR SUMMARY JUDGMENT**<br><br>Date: May 3, 2018<br>Time: 8 a.m.<br>Judge: Hon. William Alsup<br>Place: Courtroom 8 |

1

**TABLE OF CONTENTS**

2

3    NOTICE OF MOTION ........................................................................................................ 1

4    INTRODUCTION .............................................................................................................. 1

5    FACTUAL BACKGROUND ............................................................................................... 3

6    I.      The Pacific Fisher .................................................................................................. 3

7    II.     The Pacific Fisher's Collapse ................................................................................ 4

8    III.    Threats to the Pacific Fisher's Continued Existence ............................................ 5

9    STATUTORY BACKGROUND .......................................................................................... 7

10   PROCEDURAL BACKGROUND ....................................................................................... 9

11   I.      Plaintiffs' Listing Petition and the Service's Warranted but Precluded Finding ................. 9

12   II.     The Service's Status Review and Proposed Listing Rule ...................................... 10

13   III.    Peer Review of the Service's Draft Species Report and Proposed Rule .............. 11

14   IV.     The Regional Director's Decision to Withdraw the Proposed Rule ..................... 13

15   V.      The Final Species Report and Listing Withdrawal ............................................... 14

16   STANDARD OF REVIEW ................................................................................................. 14

17   ARGUMENT ...................................................................................................................... 15

18   I.      Plaintiffs Have Standing to Challenge the Service's Listing Withdrawal. ........... 15

19   II.     The Service Failed to Articulate a Rational, Legal Basis for Withdrawing Its
20           Proposed Listing Rule. ........................................................................................... 16

21           A.      The Service Found that Pacific Fishers Face Numerous Threats, Many of
                     Which Will Become More Intense in the Foreseeable Future. ................... 16

22           B.      The Available Population Trend Data Does Not Provide a Rational Basis for
23                   Dismissing the Well-Documented Threats to the Pacific Fisher. .............. 18

24                   1.      The Limited Population Trend Data Does Not Support the Service's
                             Conclusion that the Two Surviving Pacific Fisher Populations Are No
25                           Longer in Decline and "Basically Stable." .................................... 19

26                   2.      The Lack of Definitive Evidence that Populations Are Currently
                             Declining Does Not Provide a Rational Basis for Dismissing Well-
27                           Documented Threats. ..................................................................... 23

28   CONCLUSION .................................................................................................................... 25

ATTACHMENT A ............................................................................................................ 27

ATTACHMENT B ............................................................................................................ 28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Cattle Growers' Ass'n v. Salazar,*
    606 F.3d 1160 (9th Cir. 2010) ...........................................................................................15

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
    246 F. Supp. 3d 1272 (N.D. Cal. 2017) ..............................................................................20

*Ctr. for Biological Diversity v. Kempthorne,*
    466 F.3d 1098 (9th Cir. 2006) ...........................................................................................10

*Ctr. for Biological Diversity v. Norton,*
    No. C 01-2106 SC (N.D. Cal., April 4, 2003) ......................................................................9

*Ctr. for Biological Diversity* v. *Salazar,*
    No. 3:10-cv-01501-JCS (N.D. Cal., filed Apr. 8, 2010)......................................................10

*Defenders of Wildlife v. Babbitt,*
    958 F. Supp. 670 (D.D.C. 1997) .......................................................................9, 20, 23, 25

*Defenders of Wildlife v. Jewell,*
    176 F. Supp. 3d 975 (D. Mont. 2016).........................................................................3, 20, 23, 24

*Greater Yellowstone Coal., Inc. v. Servheen,*
    665 F.3d 1015 (9th Cir. 2011) ...........................................................................................14

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977)...........................................................................................................15

*League of Wilderness Defs./Blue Mt. Biodiversity Project v. Connaughton,*
    752 F.3d 755 (9th Cir. 2014) ...............................................................................................9

*Mass. v. Envtl. Prot. Agency,*
    549 U.S. 497 (2007)...........................................................................................................15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)...............................................................................................14, 23, 24

*Native Ecosystems Council v. U.S. Forest Serv.,*
    418 F.3d 953 (9th Cir. 2005) ..............................................................................................15

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ..............................................................................................9

*Or. Nat. Res. Council v. Daley*,
    6 F. Supp. 2d 1139 (D. Or. 1998) ......................................................................24

*Pollinator Stewardship Council v. Envtl. Prot. Agency*,
    806 F.3d 520 (9th Cir. 2015) ...........................................................................20

*Sierra Forest Prod., Inc. v. Kempthorne*,
    No. 2:07-CV-00060 JAMGGH, 2008 WL 2384047 (E.D. Cal. June 9, 2008)............................10

*Sw. Ctr. for Biological Diversity v. Babbitt*,
    215 F.3d 58 (D.C. Cir. 2000) .............................................................................9

*Tennessee Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ..........................................................................................8

*Tucson Herpetological Soc'y v. Salazar*,
    566 F.3d 870 (9th Cir. 2009) .......................................................................20, 22

**Statutes**

16 U.S.C. § 1531 ....................................................................................................8

16 U.S.C. § 1532 ........................................................................................8, 18, 24

16 U.S.C. § 1533 .......................................................................................... *passim*

**Federal Register Notices**

61 Fed. Reg. 4,722 (Feb. 7, 1996) ...........................................................................8

69 Fed. Reg. 18,770 (Apr. 8, 2004) ...................................................................9, 10

79 Fed. Reg. 60,419 (Oct. 7, 2014).........................................................................11

81 Fed. Reg. 22,710 (Apr. 18, 2016) .................................................................. *passim*

**Legislative History**

S. Rep. No. 97-418 (1982)........................................................................................8

**NOTICE OF MOTION**

Please take notice that Plaintiffs Center for Biological Diversity, Environmental Protection Information Center, Klamath-Siskiyou Wildlands Center, and Sierra Forest Legacy hereby move for summary judgment in the above-captioned case. Plaintiffs' motion will be heard on May 3, 2018, at 8:00 a.m., or as soon thereafter as counsel may be heard, before the Honorable William H. Alsup, at the United States District Court for the Northern District of California located at 450 Golden Gate Avenue, San Francisco, California. Plaintiffs' motion for summary judgment is based on the points and authorities set forth below, the accompanying declarations of Noah Greenwald, Robert DiPerna, George Sexton, and Susan Britting, and the administrative record certified by the defendants on July 31, 2017 (ECF 45).

Plaintiffs are entitled to summary judgment because the undisputed facts show that the U.S. Fish and Wildlife Service ("Service") violated the Endangered Species Act ("ESA") when it reversed course and withdrew a proposed rule to list the Pacific fisher, an imperiled old-growth forest animal, as a "threatened" species. *See* 81 Fed. Reg. 22,710 (Apr. 18, 2016) ("Listing Withdrawal"). Plaintiffs ask this Court to set aside the Service's illegal Listing Withdrawal, reinstate the Service's proposed listing rule, and order the Service to publish within 90 days a new rule that is based solely on "the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A).

**INTRODUCTION**

Pacific fishers—close relatives of wolverines, martens, and minks—once roamed throughout the ancient forests of Washington, Oregon and California, but by the early 1900s they had been devastated by rampant logging and fur trapping. Now only two small and isolated native populations survive, and they are hanging by threads. Facing new and increasing pressure from climate change and rampant marijuana cultivation on federal lands, as well as continued logging, vehicle strikes, and disease, Pacific fishers are at serious risk of extinction in the absence of federal protection.

Seventeen years ago, a coalition of conservation groups petitioned the Service to protect the few surviving Pacific fishers by listing them as "threatened" under the ESA. Since then, the Service has done everything possible to avoid taking action. The Service's first tact was to ignore the listing petition altogether, until Plaintiffs obtained a court order requiring the agency to respond. The

Service then conceded in 2004 that Pacific fishers are at risk of extinction and warrant listing, but the agency claimed "other priorities" precluded it from drafting a proposed listing rule. Ten years and two additional lawsuits later, the Service finally published in October 2014 a proposed rule to designate Pacific fishers as threatened under the ESA, and the agency committed to issuing a final rule in April 2016. For Plaintiffs and anyone else following the Pacific fisher's saga, protection for the Pacific fisher was in sight. No one expected what came next.

Four months before the court-ordered deadline for the Service to publish a final rule, the Service's Regional Director reversed course completely and directed his staff to withdraw its proposed listing rule. In so doing, the Regional Director did not dispute that Pacific fishers have been reduced to a tiny fraction of their range and face increasing threats on multiple fronts. Instead, the Regional Director mischaracterized a handful of inconclusive demographic studies as showing that the last two native fisher populations are "basically stable," and he wrongly demanded definitive evidence that the two tiny populations are continuing to decline if they are to receive any protection under the ESA. Consistent with the Regional Director's command, the Service formally withdrew its proposed listing rule on April 18, 2016, effectively erasing seventeen years of administrative analysis and returning Pacific fishers to square one, unprotected.

Plaintiffs, members of the coalition that submitted the original petition to list the Pacific fisher, now challenge the Service's withdrawal of its proposed rule. It is well established that listing decisions under the ESA must be made "solely on the basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). In this case, the best available science is essentially unchanged since the Service first concluded in 2004 that Pacific fishers are at risk of extinction in the foreseeable future: Pacific fishers remain at risk from the cumulative impact of multiple and increasing stressors on two small and isolated native populations. The limited population trend data since 2004, upon which the Regional Director purported to base his decision to withdraw the Service's proposed listing rule, does not provide a rational, legal basis for dismissing the best available data showing that fishers warrant immediate protection under the ESA.

Through the protections of the Endangered Species Act, the Pacific fisher might have a chance to pull itself back from the brink of extinction. But if the Service waits for "definitive"

evidence of continued population declines, it will be too late. As one court explained recently in an analogous case involving the Pacific fisher's close relative the wolverine, "if there is one thing required of the Service under the ESA, it is to take action at the earliest possible, defensible point in time to protect against the loss of biodiversity within our reach as a nation." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1011 (D. Mont. 2016). Plaintiffs therefore ask the Court to step in once again in the face of the Service's latest attempt to delay, set aside the Service's Listing Withdrawal, and require the Service to take action to protect the Pacific fisher from extinction.

## FACTUAL BACKGROUND

### I.    The Pacific Fisher

Fishers (*Pekania pennanti*) are found only in North America. AR 022623;[1] Attachment A (photograph of a fisher). Prior to European settlement, they occurred throughout the northern boreal region in Canada, and extending south to the Great Lakes and along the Appalachian, Rocky, and Pacific Coast Mountains. AR 022623. During this time, they were central to many Native American tribes' culture and folklore. The Hoopa Tribe prized their soft fur and used their skins for quivers.[2] And the Anishinabe people told of how Fisher, on a quest to save his son from starving in the cold, was able to bring warm weather down to earth by chewing a hole in the sky. Shot with arrows by the sky people for his efforts, Fisher was rescued by the great spirit Gitchee Manitou, who caught Fisher before he could fall back to earth, and placed him among the stars, into the pattern we now know as the Big Dipper.[3] Alas, while the mythical Fisher remains forever in the sky, bringing warmth back each year after a long winter, by the turn of the 20th century fisher populations on earth were largely extirpated due to unregulated trapping and habitat loss. The once contiguous populations of fisher are now fragmented, greatly reduced, and geographically isolated from one another. AR 022624–25.

The population of fishers that inhabits the West Coast of the United States in Washington, Oregon, and California—a population referred to as the "Pacific fisher"— is now physically separated from fisher populations in Canada by over 200 miles, and is separated from populations to

---

[1] Documents in the administrative record are cited as "AR" followed by the Bates'-stamp number.
[2] Pliny Earle Goddard, *Life and Culture of the Hupa* 36 (1903).
[3] Michael J. Caduto & Joseph Bruchac, *Keepers of the Earth: Native American Stories and Environmental Activities for Children* 117–120 (1997).

the east by over 90 miles, "well beyond the dispersal range for the species." AR 000013–14. Pacific fishers are also physically and genetically distinct from other fisher populations, and are adapted to different types of habitat. AR 000014–15.

Pacific fishers generally prefer older or "late successional" forests. Female fishers give birth and raise kits in dens made from hollows in large, old trees, AR 022608; AR 022615–17, and fishers prey on other forest-dwelling mammals, including mice, squirrels and birds. AR 022613. They are also "one of the few predators that successfully kills and eats porcupines." *Id.* Because they rely on forest with "abundant physical structure," AR 022613, fishers avoid open forest, grasslands, and wetlands. AR 022617. Except for mothers with kits, they are usually solitary and territorial forest dwellers. AR 022607; AR 022610–11. Fishers have large and non-overlapping ranges, and they naturally occur at low population densities. They can therefore be difficult to detect. AR 022627.

**II.    The Pacific Fisher's Collapse**

Historically, Pacific fishers occupied forests from Washington's Olympic Peninsula and Northern Cascades, down through California's Southern Sierra Nevada. AR 022387; Attachment B (map of current Pacific fisher populations and historic range). Starting in the 1800s, the Pacific fisher's old-growth habitat in Washington, Oregon, and California saw "sharp declines" due to logging, with as much as 82–87% of these forests lost in Washington and Oregon. AR 022659. In the late 1800s and early 1900s, Pacific fishers were also extensively killed for their high-value pelts. AR 022723.

As a result of this extensive logging and trapping, Pacific fishers now exist in only a small fraction of their historic range. In Washington, northern Oregon, and central Oregon, the Service has concluded that Pacific fishers "appear to be likely extirpated, except on the Olympic Peninsula where they have been recently reintroduced." AR 022635. They have also largely disappeared from their historic range in the central and northern Sierra Nevada. According to the Service, only two native populations of Pacific fisher still survive: "one in the southern Sierra Nevada . . . and the other in northern California and southwestern Oregon." AR 022630. Collectively, these last two native populations occupy only about 15% of the Pacific fisher's historic range. AR 022635. By all accounts, these two remaining native fisher populations are small and isolated. According to the

1   Service, estimates of the northern California/southwestern Oregon ("North Coast") population

2   "range from a population size of 258 to 4,018." AR 022641. Estimates for the southern Sierra

3   Nevada ("Southern Sierra") population range from a low of 100 to a high of just 500 individuals. AR

4   022647.

5   **III.     Threats to the Pacific Fisher's Continued Existence**

6          Already reduced to a tiny fraction of their historic range, the last surviving native Pacific

7   fisher populations are faced with continued and increasing threats.

8          According to the Service, the "greatest long-term risk" to the species is simply their small

9   population size and isolation. AR 022734–35. The Service has explained that, "[a] principle of

10  conservation biology is that small, isolated populations are subject to an increased risk of extinction

11  from stochastic, genetic, or demographic events." AR 022731. Fishers "have several characteristics

12  related to small population size that increase the species' vulnerability to extinction from stochastic

13  events and other threats on the landscape." AR 022734–35. In particular:

14          Small populations of low-density carnivores, like fishers, are more susceptible to
15          small increases in mortality factors due to their relatively low fecundity and low
            natural population densities. Fishers may also be prone to instability in population
16          sizes in response to fluctuations in prey availability. Low reproductive rates retard the
            recovery of populations from declines, further increasing their vulnerability.

17  *Id.* (citations omitted).

18          In short, for the last two populations of Pacific fisher, which are already greatly reduced due

19  to historical trapping and habitat loss, AR 022757, "[e]nvironmental changes such as drought, fire,

20  or storms could have severe consequences." AR 022731. And worse, both populations face grave

21  new threats, including threats from climate change and exposure to rodenticides that the Service

22  projects will only increase in the future.

23          For example, as global temperatures rise with climate change, many areas are becoming

24  hotter and drier, including inland California. AR 022678–81. Increasing temperature and drought, in

25  turn, are projected to lead to increased forest mortality from insect and disease outbreaks, all of

26  which can cause rapid habitat conversion and therefore habitat loss for the Pacific fisher.

27  AR 022687. Climate change will also lead to increasingly destructive wildfires. AR 022687–88.

28  Wildfire is a natural part of the ecological process, and small-scale and mixed-severity fires can even

1    have beneficial effects to the fisher through the creation of dead logs suitable for dens. AR 022721.

2    But large and severe fires, in contrast, can "reduce habitat quality and population size," as well as

3    connectivity between habitats. AR 022667. This is particularly true when, post-fire, remaining dead

4    trees that could provide habitat are removed through what is known as "salvage" (i.e., post-fire)

5    logging, which routinely occurs after fires on national forest lands. *Id.*, AR 022669; *see also, e.g.*,

6    AR 170746 (comments of Environmental Protection Information Center explaining harms of salvage

7    logging). As a result of global warming, the Service predicts high-severity fires will increase,

8    particularly in the increasingly drought-prone Southern Sierra Nevada area. AR 022669. These

9    increasing high-severity fires, especially when coupled with post-fire logging, therefore pose a threat

10   to the Pacific fisher that the Service acknowledges "is likely to increase in the future." *Id.*; *accord*

11   AR 024000 ("In light of the precarious nature of the southern Sierra Nevada fisher population and its

12   narrowly distributed habitat, fires that burn with high severity over large areas pose a significant risk

13   to the population by reducing and fragmenting habitat.").

14          Exposure to anticoagulant rodenticides also poses a "newly identified" threat to the Pacific

15   fisher. AR 000690. Anticoagulant rodenticides are designed to kill small pest mammals. AR 022740.

16   They act by thinning an animal's blood, and exposure is manifested by bleeding nose and gums,

17   extensive bruises, anemia, fatigue, and difficulty breathing. *Id.* An animal exposed to anticoagulant

18   rodenticides may live for several days after exposure, but may become lethargic and more easily

19   caught by predators. AR 022740. Large quantities of anticoagulant rodenticides have increasingly

20   been found at illegal marijuana cultivation sites within Pacific fisher habitat, where they are often

21   used indiscriminately by growers to discourage mice from chewing marijuana plants and plastic

22   irrigation lines. AR 022747. Fishers can be exposed to anticoagulant rodenticides both through direct

23   consumption, or through eating sluggish prey that has consumed the rodenticides. AR 022748.

24   Scientists have determined that the Pacific fisher's exposure to anticoagulant rodenticides in

25   California "appears to be widespread, with residues found in 65 of 77 (*84 percent*) fisher carcasses

26   tested." AR 022739 (emphasis added).

27          The most recent study on fisher mortality found that fisher mortality from anticoagulant

28   rodenticides is increasing. The study found exposure to anticoagulant rodenticides was the cause of

5.65% of fisher deaths between 2007 and 2011, but 18.7% of fisher mortalities between 2012 and 2014. AR 010949 (M. Gabriel, 2015). The timing of anticoagulant rodenticides use at cultivation sites (usually April and May) may also be a threat to the fisher, "because a reduction in rodent prey at this time coincides with increased energetic requirements of pregnant or lactating female fishers, increasing the likelihood of miscarriages due to inadequate nutrition or starvation of dependent kits due to reduced fitness of the adult female." AR 022756. Studies have shown that fewer female fishers survive when there are high numbers of marijuana sites in their home ranges, and that reductions in female survivorship may result in "disproportionately large declines in population size." AR 022755. The Service therefore concludes that "the observed reduction in adult female survivorship for females with higher numbers of marijuana cultivation sites within their home ranges . . . may result in significant population-level impacts in the near future." AR 022755.

Ultimately, the Service has concluded that, "[c]ombinations of stressors accumulate and interact to increase the risk of extinction." AR 022757. The Service has explained: "Any given source of mortality or habitat loss may affect a small proportion of individuals or of the range, but when all sources are added together, the effect may be substantial. Furthermore, some combinations of stressors may act together synergistically to cause effects greater than the sum of the individual effects of each stressor." *Id.* Stressors may be the most pronounced in the Southern Sierra population "because of small population size and factors consequent to small population size such as isolation, low reproductive capacity, and demographic and environmental stochasticity. Furthermore, the potential effects of stochastic events on small populations combined with difficult to quantify interactions and synergy among stressors . . . can exacerbate risk." *Id.*

To put it simply, for the remaining isolated Pacific fisher populations, already subject to a number of stressors, the Service acknowledges that a single chance event—like a large wildfire or a sudden outbreak of disease—has "the potential to cause sudden, sharp declines in the populations," potentially leading to rapid extinction. AR 022759.

## STATUTORY BACKGROUND

Congress enacted the Endangered Species Act in 1973 to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and

1    "a program for the conservation of such endangered species and threatened species." 16 U.S.C.

2    § 1531(b). The statute contains an array of provisions designed to afford imperiled species "the

3    highest of priorities," so that they can recover to the point where federal protection is no longer

4    needed. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). To benefit from the ESA's

5    provisions, however, a wildlife species must first be "listed" by the Secretary of Interior as

6    "threatened" or "endangered" under Section 4 of the Act. 16 U.S.C. § 1533. Congress therefore

7    described Section 4 as "[t]he cornerstone of effective implementation of the Endangered Species

8    Act." S. Rep. No. 97-418, at 10 (1982).

9          Section 4 provides that any person may petition the Secretary to list a terrestrial species as

10   threatened or endangered. 16 U.S.C. § 1533(b). A species is considered "endangered" if it "is in

11   danger of extinction throughout all or a significant portion of its range" and "threatened" if it "is

12   likely to become an endangered species within the foreseeable future throughout all or a significant

13   portion of its range." 16 U.S.C. § 1532(6), (20). And the term "species" is defined broadly to include

14   "any subspecies of fish or wildlife or plants, and any *distinct population segment* of any species of

15   vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16) (emphasis added). The

16   ESA does not define the term "distinct population segment" ("DPS"). However, the Service adopted

17   a policy in 1996 to guide its evaluation as to whether a vertebrate population constitutes a DPS. *See*

18   61 Fed. Reg. 4,722 (Feb. 7, 1996), AR 035858. In short, the Service weighs the "discreteness of the

19   population segment in relation to the remainder of the species to which it belongs" and the

20   "significance of the population segment to the species." *Id.* at 4,725, AR 035861. If it is both discrete

21   and significant, the population is considered a DPS and, therefore, a "species" under the ESA.

22         Upon receiving a listing petition, the Secretary, acting through the Service, must issue an

23   initial finding within 90 days as to whether the petition "presents substantial scientific or commercial

24   information indicating that the petitioned action may be warranted." 16 U.S.C. § 1533(b)(3)(A). If it

25   does, the Service must "promptly commence a review of the status of the species" to determine

26   whether listing is warranted. *Id.* At the conclusion of the status review, and within 12 months of

27   receiving the petition, the Service must make a finding that either (1) listing is warranted; (2) listing

28   is not warranted; or (3) listing is warranted but precluded by other pending proposals. 16 U.S.C.

1   § 1533(b)(3)(B).

2          Importantly, the ESA requires the Service to make its listing determinations "solely on the

3   basis of the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). According to

4   the Ninth Circuit Court of Appeals, "[t]he ESA's requirement that agencies use the best scientific

5   and commercial data available means that agencies must support their conclusions with accurate and

6   reliable data." *League of Wilderness Defs./Blue Mt. Biodiversity Project v. Connaughton*, 752 F.3d

7   755, 763–64 (9th Cir. 2014). However, "the Service may not ignore evidence simply because it falls

8   short of absolute scientific certainty." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d

9   1136, 1147 (9th Cir. 2007). Indeed, "[e]ven if the available scientific and commercial data were

10  quite inconclusive, [the Service] may—indeed must—still rely on it." *Sw. Ctr. for Biological*

11  *Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). By directing the Service to base its listing

12  decision on the best available data—as opposed to "conclusive" or "definitive" data— Congress

13  meant for the Service "to take preventive measures *before* a species is conclusively headed for

14  extinction." *Defenders of Wildlife v. Babbitt*, 958 F. Supp. 670, 679–80 (D.D.C. 1997).

### PROCEDURAL BACKGROUND

15

16  **I.    Plaintiffs' Listing Petition and the Service's Warranted but Precluded Finding**

17          In November 2000, several conservation organizations, including Plaintiffs, petitioned the

18  Service to list the Pacific fisher as endangered under the ESA. AR 038212–309. The petition

19  described in detail the substantial scientific evidence demonstrating that Pacific fishers have declined

20  dramatically throughout their west coast range and are at serious risk of extinction due to the

21  cumulative impact of multiple ongoing and increasing threats. AR 038218. When the Service

22  subsequently failed to follow the ESA's deadline for responding to the listing petition, several of the

23  Plaintiffs here, along with others, sued the Service. They ultimately secured an order requiring the

24  Service to determine by April 2004 whether the Pacific fisher warrants listing. *Ctr. for Biological*

25  *Diversity v. Norton*, No. C 01-2106 SC (N.D. Cal., April 4, 2003).

26          On April 8, 2004, the Service announced its finding that the Pacific fisher warrants listing

27  under the ESA. AR 000007–30 (69 Fed. Reg. 18,770 (Apr. 8, 2004)). First, the Service agreed that

28  the Pacific fisher qualifies as a distinct population segment eligible for listing, finding that "loss of

the species from the west coast range in the United States would represent (1) a significant gap in the species' range, (2) the loss of genetic differences from fisher in the central and eastern United States, and (3) the loss of the species from a unique ecological setting." AR 000015–16. Second, the Service concluded that "the overall magnitude of threats to [the Pacific fisher] is high." AR 000030. In particular, the Service recognized that "West Coast fisher populations, particularly in the southern Sierra, may be at significant risk of extinction because of small population size and factors consequent to small population size such as isolation, low reproductive capacity, demographic and environmental stochasticity."[4] AR 000027.

Despite finding that Pacific fishers warrant listing, the Service nevertheless declined to publish a proposed listing rule, claiming that "an immediate proposal to list is precluded by other higher priority listing actions." AR 000030. As a result, the Pacific fisher was left unprotected under the ESA, and Plaintiffs were left to wonder when or if the Service might eventually decide to publish a proposed listing rule. *See generally Ctr. for Biological Diversity v. Kempthorne,* 466 F.3d 1098, 1103–04 (9th Cir. 2006) (discussing the Service's use of the ESA's "warranted but precluded" provision to effect indefinite delay in listing the mountain yellow-legged frog).

## II.    The Service's Status Review and Proposed Listing Rule

Six years after confirming that the Pacific fisher is at risk of extinction and warrants listing under the ESA, the Service had made no further progress toward publishing a proposed listing rule, so Plaintiffs here sued the Service again for its continued delay. *Ctr. for Biological Diversity* v. *Salazar,* No. 3:10-cv-01501-JCS (N.D. Cal., filed Apr. 8, 2010). Plaintiffs dismissed that suit in October 2011, after the Service agreed to a court-ordered settlement in another case that required the agency to publish by no later than September 30, 2014, either a proposed rule listing the Pacific fisher under the ESA or a final determination that listing the Pacific fisher is not warranted. *In re Endangered Species Act Section 4 Deadline Litig.*, Misc. Action No. 10-377 (EGS), MDL Docket

---

[4] A timber company challenged the Service's designation of the Pacific fisher as a distinct population segment and the Service's determination that listing was warranted. *Sierra Forest Prod., Inc. v. Kempthorne*, No. 2:07-CV-00060 JAMGGH, 2008 WL 2384047, at *1 (E.D. Cal. June 9, 2008), aff'd, 361 F. App'x 791 (9th Cir. 2010). A district court rejected the timber company's challenge, finding that the Service's conclusions were scientifically supported, and the Ninth Circuit affirmed. *Id.*

No. 2165 (D.D.C. Sept. 9, 2011).

On October 7, 2014, the Service published a proposed rule to list the Pacific fisher as a threatened species under the ESA. AR 000676 (79 Fed. Reg. 60,419 (Oct. 7, 2014)). The Service concluded that the main threats to the Pacific fisher are "habitat loss from wildfire and vegetation management; toxicants (including anticoagulant rodenticides); and the cumulative and synergistic effects of these and other stressors acting on small populations." AR 000677. Specifically, the Service recognized that the "greatest long-term risk" is "the isolation of small populations and the higher risk of extinction due to stochastic events" and concluded that "small population size constitutes a threat to fisher, now and in the future." AR 000691. It found "wildfire and fire suppression to be a threat to fisher habitat now and in the future because the frequency and size of wildfires is increasing" and found this trend to be "particularly problematic" for the Southern Sierra population. AR 000686. The Service also recognized anticoagulant rodenticides "as a newly identified threat because of reported mortalities of fishers from toxicants and a variety of potential sublethal effects." AR 000690.

In the proposed rule, the Service acknowledged that demographic studies of the two remaining native fisher populations—the Southern Sierra and North Coast populations—showed no signs that the devastated Pacific fisher populations had recovered. AR 000693. Precise population trends were inconclusive: there were no clear studies showing that the populations were currently increasing, stable, or decreasing. *Id.* Even without definitive evidence regarding population trends, the Service rationally concluded that the Pacific fisher is "likely to become endangered throughout all of its range in the foreseeable future . . . based on multiple threats impacting the remaining two extant native original populations and the cumulative and synergistic effects of the threats on small populations." *Id.*

III.    **Peer Review of the Service's Draft Species Report and Proposed Rule**

After publishing the proposed rule, the Service solicited peer reviews from scientific experts of its Draft Species Report, which was intended to "synthesize the best available science and commercial information regarding the fisher," and of the proposed listing rule. AR 022360. The purpose of the peer review process was to provide a "review of [the] draft product for quality by

specialists in the field who were not involved in producing the draft." AR 109037 (guidance on peer review). By ensuring that the Service's Species Report and proposed listing rule had undergone peer review, the Service could certify "that the quality of published information meets the standards of the scientific and technical community." *Id.* Peer review was thus a crucial part of the Service's evaluation of threats to the Pacific fisher.

According to the Service, the peer review comments on the Draft Species Report and proposed listing rule were overwhelmingly "positive." AR 123797; AR 113897. A common theme to the peer reviews, echoed by prominent Pacific fisher biologist Dr. William Zielinski, was that the Draft Species Report represented "the most comprehensive review of the literature on western fishers ever compiled." AR 179182. Peer reviewers, all experts on the fisher, deemed the draft "accurate," "sound," "logical," "thorough," "excellent," "reasonable" "well reasoned and convincing," and "exhaustive." AR 178919; AR 178924; AR 178927; AR 179174; AR 179176; AR 179188; AR 179206; AR 179212; AR 179235; AR 179258; AR 179260. Those peer reviewers who commented specifically on the Service's proposal to list the Pacific fisher as threatened all noted that this conclusion was well supported by the Draft Species Report. For example:

- Dr. David Graber, formerly chief scientist of the Pacific west region of the National Park Service, noted that "the Report provides an excellent basis for the Proposed Rule, as well as for developing recovery plans." AR 179174.
- Fisher biologist Dr. Gilbert Proulx, wrote "I believe that the application for the threatened species status for the west coast fisher population (OR, CA, WA) is justified." AR 179251.
- Dr. S. Blake Murden, Director of Wildlife and Fisheries at Port Blakely Tree Farms, LP, concluded "[o]verall, this is a well researched and well-written proposed rule." AR 179249.
- Dr. Michael Schwartz, Director of National Genomics Center for Wildlife and Fish Conservation, noted that "[t]he background work presented in the draft species report helped me understand the logic behind the decisions that were ultimately made in the proposed rule." AR 179366.
- Dr. Keith Aubry, Emeritus Scientist at United States Department of Agriculture, stated "I thought the approaches you used to characterize the scope and severity of potential threats and potential cumulative or synergistic effects were also well reasoned and convincing." AR 179235.

**IV.     The Regional Director's Decision to Withdraw the Proposed Rule**

Following the overwhelmingly positive peer review on their Species Report and proposed listing rule, Service biologists then waited for months for a final listing decision to be made by the Service's Pacific Southwest Regional Director. AR 125406; AR 125409. As they waited, the biologists became increasingly concerned about meeting deadlines to publish the final rule by the April 7, 2016 deadline. AR 124532 (October 2, 2015 email noting that "We are concerned that we will not be able to meet the April 7, 2016 deadline if we do any kind of revised proposal and solicit public review and comment"); AR 125409 (November 12, 2015 call notes stating that that "[t]imelines are getting short to meet the deadline and about half the comments can't be addressed without knowing what the decision will be").

On December 8, 2015, the Regional Director announced that he had decided that the proposed rule to list the Pacific fisher as threatened should be withdrawn in its entirety. AR 126177; *see also* AR 126147 (noting that the decision to withdraw the proposed rule came from the Regional Director). According to call notes, the Regional Director's "[d]ecision hinged on the fact that we have not yet seen threats acting to the point where there are declining population trends since the time of the 'warranted but precluded' finding. Threats are evident but we haven't seen the effects on populations yet." AR 126177.

The Regional Director's about-face left some of his staff biologists confused. One member of the listing team immediately reached out over email asking to "get on the phone" to "better understand our rationale" because "[a]t this point, we're not entirely sure we understand what to say" in their response to comments. AR 126331. After more than a decade of confirming that the scientific evidence demanded protecting the Pacific fisher under the ESA, and with only four months remaining until the listing decision was due, the team of biologists entered "crisis mode." AR 126892. The team's leader encouraged the team that "[w]e can all only do the best we can in the time that's left . . . I want us to look forward and not backward." AR 126979. And although some expressed concerns about the scientific integrity of the Listing Withdrawal, *see, e.g.,* AR 135054 (noting discussion of ways that listing withdrawal "may not be in conformance with scientific integrity principles"), for the most part the biologists fell into line, working feverishly over the next

1    four months to finalize the Species Report, finish responding to comments, and finalize the

2    withdrawal of the proposed rule. *See generally* AR 126166–153068. On April 18, 2016, the

3    biologists finished their "marathon," AR 151860, and the Service published the Listing Withdrawal,

4    AR 000711.

5    **V.    The Final Species Report and Listing Withdrawal**

6           In the end, the Listing Withdrawal and the Final Species Report did not identify new or better

7    scientific information indicating that the threats identified in the proposed rule had been addressed or

8    were no longer at issue. Instead, the Listing Withdrawal explained that the Service simply "arrived at

9    a different conclusion regarding the status of fishers in the west coast States [sic]." AR 000733l;

10   *accord* AR 133155 (Service Regional Listing Coordinator explaining that "we previously drew

11   conclusions based on information" and "[w]e're now drawing different conclusions on that same

12   information"). The decision ultimately rested on the Regional Director's assertion that there is no

13   information showing that stressors are "functioning as operative threats," AR 000715, because "there

14   is no indication that any of the monitored populations are exhibiting a population growth trend that is

15   other than essentially stable," AR 000729. The Service concluded that "no portion" of the Pacific

16   fisher's population was in danger of extinction—not even the tiny and particularly at-risk Southern

17   Sierra population. AR 000735.

**STANDARD OF REVIEW**

18

19          The Administrative Procedure Act ("APA") provides the standard of review in lawsuits

20   challenging the Service's ESA listing decisions. *Greater Yellowstone Coal., Inc. v. Servheen*, 665

21   F.3d 1015, 1023 (9th Cir. 2011). Consistent with the APA, a court must hold unlawful and set aside

22   "agency actions found to be arbitrary, capricious, an abuse of discretion, or contrary to law." *Id.*

23   (quoting 5 U.S.C. § 706(2)(A)). Agency action will be invalidated as "arbitrary and capricious" if

24   "the agency has relied on factors which Congress has not intended it to consider, entirely failed to

25   consider an important aspect of the problem, offered an explanation for its decision that runs counter

26   to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

27   view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

28   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The APA demands "a substantial inquiry, a thorough,

14

1  probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th

2  Cir. 2005) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16 (1971)).

3  Even when the Service acts within its area of competence, a court "need not defer to the agency

4  when the agency's decision is without substantial basis in fact, and there must be a rational

5  connection between the facts found and the determinations made." *Ariz. Cattle Growers' Ass'n v.*

6  *Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010).

## ARGUMENT

### I.    Plaintiffs Have Standing to Challenge the Service's Listing Withdrawal.

9         At the outset, Plaintiffs have standing to sue because: (1) Plaintiffs' "members would

10  otherwise have standing to sue in their own right"; (2) the interests Plaintiffs seek to protect "are

11  germane to the[ir] organization[al] purpose[s]"; and (3) "neither the claim asserted nor the relief

12  requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple*

13  *Advert. Comm'n*, 432 U.S. 333, 343 (1977).

14         The sworn declarations of Noah Greenwald, George Sexton, Susan Britting, and Robert

15  Diperna, submitted herewith, demonstrate that Plaintiffs' members would have standing to sue in

16  their own right. Plaintiffs' members have professional and personal interests in observing the Pacific

17  fisher, but they will be unable to do so if the Pacific fisher goes extinct due to the Service's failure to

18  grant it protection under the Endangered Species Act. Greenwald Decl. at ¶¶ 9–14; Sexton Decl. at

19  ¶¶ 5–6; Britting Decl. at ¶¶ 6–8; Diperna Decl. at ¶ 6. These declarations therefore show that the

20  Service's decision to withdraw its proposed rule has caused Plaintiffs' members to suffer concrete

21  and particularized injuries that are fairly traceable to the defendants and likely to be redressed by a

22  favorable decision. *See Mass. v. Envtl. Prot. Agency*, 549 U.S. 497, 517 (2007) (setting forth the

23  requirements for individual standing). The interests at stake in this lawsuit are also germane to

24  Plaintiffs' organizational purposes—which include conservation of the Pacific fisher—and neither

25  Plaintiffs' claims nor Plaintiffs' request for prospective equitable relief requires the participation of

26  individual members. Greenwald Decl. at ¶ 4; Sexton Decl. at ¶ 4; Britting Decl. at ¶¶ 4–5; Diperna

27  Decl. at ¶¶ 4–5. Accordingly, Plaintiffs have standing. *See Hunt*, 432 U.S. at 343.

28

1

**II.     The Service Failed to Articulate a Rational, Legal Basis for Withdrawing Its Proposed Listing Rule.**

2

3         Turning to the merits, the Service's Listing Withdrawal violated the ESA. The best available

4    science demonstrates that Pacific fishers are at risk of extinction in the foreseeable future throughout

5    all or a significant portion of their range—i.e., "threatened,"—due to the cumulative impact of

6    increasing stressors on already small and isolated populations. The Service did not provide a rational

7    basis for dismissing these well-documented stressors. As set forth below, the limited and

8    inconclusive evidence regarding the Pacific fisher's current population trend cannot reasonably be

9    construed as affirmative evidence that populations are "stable." And the absence of "definitive"

10   evidence demonstrating conclusively that populations are currently declining does not provide a

11   rational basis for dismissing threats that the Service concluded are likely to result in further

12   population declines in the foreseeable future. The Service's Listing Withdrawal was therefore

13   arbitraray and capricious.

14        **A.     The Service Found that Pacific Fishers Face Numerous Threats, Many of Which Will Become More Intense in the Foreseeable Future.**

15        The best available science, contained in the Service's own Final Species Report,

16   demonstrates that the Pacific fisher is facing numerous threats, many of which are likely to increase

17   in the future, and that it should therefore be listed as threatened under the ESA.

18        The ESA requires the Service to make its listing determinations "solely on the basis of the

19   best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). Here, the Service's own

20   Final Species Report documents that Pacific fishers have largely gone extinct throughout their

21   historic range, and have not recovered. AR 022659; AR 022723; AR 022635; AR 022630. It

22   acknowledges that the remaining Pacific fisher populations face numerous threats, including from

23   small population size and isolation, predation, disease, poisoning, vehicular strike, habitat loss,

24   logging, wildfire, and human development, AR 022608–09; AR 022656–711; AR 022723–57, and

25   that threats can act cumulatively and synergistically to "increase the risk of extinction." AR 022757.

26        According to the Service's Species Report, many of these threats are likely to become more

27   pronounced in the future. For example, climate change will increasingly be a threat, particularly to

28   the native Southern Sierra population. High-severity fires due to climate change are "likely to

16

increase in the future," directly impacting Pacific fishers and their habitat. AR 022669. The Service
acknowledges that along with increasing fire, "[s]everal different kinds of forest disturbances are
likely to increase due to climate change," including "insect and disease outbreaks, droughts,
windstorms, and flooding." AR 022687. According to the Service, "most" projections of fisher
habitat show "suitable fisher habitat in the Sierra Nevada [is] most vulnerable to the effects of
climate change," AR 022690, with the majority of studies showing climate change as causing "losses
of up to 62 percent of currently forest habitat by the late 21st century as a result of disturbance and
subsequent conversion to grassland, shrubland, or woodland." AR 022690. The Service explains that
"[w]hen habitat is lost, it may take many decades to return. Therefore, even though habitat loss has
an immediate impact on fisher populations, its effects are also expected to continue in the future,
possibly for many decades until trees become large and old enough to generate the structures needed
for fisher denning and resting." AR 022655. The Service acknowledges that these shifts in habitat
due to climate change and fires could represent "a long term loss of fisher habitat." AR 022690.

        The Service also recognizes that anticoagulant rodenticides pose a new and increasing risk.
"The number of [marijuana] plants removed from national forests increased dramatically in each of
the past 5 years, reaching a new record for eradication in 2010 of over 3.5 million plants from 59
national forests." AR 022747. The Service acknowledges that recent studies have shown that the
majority of fishers in California test positive for exposure to anticoagulant rodenticides. AR 022739–
40. Recent studies also show that exposure is both increasing and increasingly causing mortality.
AR 010949 (2015 study finding that anticoagulant rodenticide exposure caused 18.7% of fisher
mortalities in California from 2012–2014). This increasing exposure, coupled with modeling
showing that a 10–20% mortality increase in the Southern Sierra population "may be enough to
prevent population expansion," has led the Service and others to conclude that anticoagulant
rodenticides exposure in the Southern Sierra population "may result in significant population-level
impacts in the near future." AR 022755; *see also* AR 010897 (M. Gabriel, et al., 2012, ubiquitous
exposure to anticoagulant rodenticides is "of significant concern"); AR 010949 (M. Gabriel, et al.,
2015, "this anthropogenic threat is of increasing concern").

        These increasing threats will impact the two remaining native populations that the Service

acknowledges are small and isolated, and therefore "subject to an increased risk of extinction from stochastic, genetic, or demographic events." AR 022731; *accord* AR 023999 ("the cumulative effect of multiple factors could extirpate the [Southern Sierra] population"). As the Service itself explains, "all native and reintroduced populations within the analysis are relatively small and isolated, increasing the vulnerability of these populations to stochastic changes in survival and reproductive rates. Thus, if fisher mortality increases due to the stressors listed above, stochastic fluctuations in demographic parameters have the potential to cause sudden, sharp declines in the populations." AR 022758.

In sum, the best available science demonstrates that the Pacific fisher is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range, due to numerous and increasing threats acting upon small and isolated populations, and therefore warrants protection under the ESA. 16 U.S.C. § 1532(20).

**B.     The Available Population Trend Data Does Not Provide a Rational Basis for Dismissing the Well-Documented Threats to the Pacific Fisher.**

For more than a decade, the Service repeatedly acknowledged the best available science demonstrates that the "greatest long-term risk" to the Pacific fisher is that its populations are small and isolated,[5] that they face increasing threats,[6] and that they should be listed as threatened under the ESA.[7] Then, after years of delay and with only a few months remaining to make a final listing decision, the Service again found reason to delay protecting the Pacific fisher. AR 000715.

With no change in the threats to the Pacific fisher's existence, the Service suddenly required evidence that these threats be "operative" or "manifested"—i.e., currently causing detectable declines—in order to grant protection to the species. AR 000715; AR 000721; AR 000730; AR 000734; AR 000756; AR 000774; AR 000795; AR 000804 (Service repeatedly citing lack of "operative" or "manifested" threats as reason for withdrawal). In the words of one Service biologist,

---

[5] AR 022731 (2016 Final Species Report); AR 000691 (2014 Proposed Rule); AR 022499; AR 022524–25 (2014 Draft Species Report); AR 000028 (2004 Warranted but Precluded finding); AR 000006 (2003 90-day finding).

[6] *See, e.g.,* AR 022669; AR 022755 (2016 Final Species Report); AR 000685–89 (2014 Proposed Rule); AR 022418; AR 022521 (2014 Draft Species Report); AR 000017–18 (2004 Warranted but Precluded finding); AR 000004–06 (2003 90-day finding).

[7] AR 000001–08; AR 000007–30; AR 000676–700.

the Service's logic boiled down to the belief that "if the threats are not operative, they kinda are not

threats, right?" AR 134272. Because the Service believed—without foundation evidence—that the

science showed stable populations, it determined that there were no operative threats and thus the

Pacific fisher should not be protected under the ESA. AR 000729; AR 000718; AR 000768; AR

134274 (Service email explaining that the rationale for withdrawal was "basically based on an

acknowledgement that there are threats out there, but they are not being manifested on the ground

(e.g., not seeing declining populations)"). However, as explained below, the Service's assertion that

the science shows stable populations was fundamentally mistaken, and its belief that threats that

have yet to cause marked population declines are "kinda not threats" was misguided. The Service's

rationale for failing to protect the Pacific fisher was therefore arbitrary and capricious and contrary

to the best available science.

> **1.      The Limited Population Trend Date Does Not Support the Service's Conclusion that the Two Surviving Pacific Fisher Populations Are No Longer in Decline and "Basically Stable."**

The Service erred in concluding that the proposed rule should be withdrawn because Pacific

fisher populations are "basically" or "essentially" stable. *See, e.g.*, AR 000718; AR 000729. None of

the scientific studies the Service reviewed actually concluded that populations are stable overall and

that therefore Pacific fishers are not threatened. In fact, several of the relied-upon studies specifically

expressed concern for the future of the Pacific fisher. Moreover, the Service acknowledges that

fishers are difficult to survey, because they live in remote areas and are wide ranging, AR 022627,

and that the studies conducted were only of very small portions of the fisher's range, AR 022641.

The studies are thus too limited and inconclusive to provide any basis for concluding that the

remnant populations are now stable overall. The science simply does not show that Pacific fisher

populations are no longer at risk. Instead, the science demonstrates what it has always demonstrated:

Pacific fishers have been devastated by logging, fur trapping, and other "stressors," and the two

remaining native populations are small, have shown no signs of rebound, and remain at high risk of

extinction. *See, e.g.,* AR 022640; AR 022640–42; AR 022647–48.

Courts have repeatedly explained that "[i]f the science on population size and trends is

underdeveloped and unclear, the Secretary cannot reasonably infer that the absence of evidence of

1   population decline equates to evidence of persistence." *Tucson Herpetological Soc'y v. Salazar*, 566

2   F.3d 870, 879 (9th Cir. 2009); *see also Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d at 1006

3   (finding it was arbitrary and capricious for the Service to claim there was no threat to the wolverine

4   because of a lack of data confirming a threat); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife*

5   *Serv.,* 246 F. Supp. 3d 1272, 1279-81 (N.D. Cal. 2017) (rejecting Service's attempt to rely on

6   absence of recent data showing a declining population to conclude that the marten population had

7   stabilized). Moreover, "an agency cannot rely on ambiguous studies as evidence of a conclusion that

8   the studies do not support." *Pollinator Stewardship Council v. Envtl. Prot. Agency*, 806 F.3d 520,

9   531 (9th Cir. 2015); *see also Defenders of Wildlife v. Babbitt*, 958 F. Supp. at 681–82 (Service could

10   not rely on study that found the lynx to be "in serious trouble" for the proposition that lynx

11   populations had increased and therefore the species did not warrant listing under the ESA).

12       Here, the Service cited four studies in support of its argument that populations are "stable":

13   two studies in the Southern Sierra and two in the North Coast. None of these studies provide a

14   rational basis for the Listing Withdrawal. For the Southern Sierra population, the Service relied

15   primarily on Rick Sweitzer et al., "Reproduction, abundance, and population growth for a fisher

16   (*Pekania pennanti*) population in the Sierra National Forest, California," for the conclusion that the

17   Southern Sierra population is "basically stable." AR 000718. But this article actually found a

18   population growth rate of 0.97, which indicates a slightly *decreasing* population (a population

19   growth rate of 1.0 is stable). AR 024639. The authors also expressed concern for the viability of the

20   Southern Sierra population. They explained that "[w]e believe that the combination of a population

21   growth rate slightly below 1.0 [the number demonstrating a stable population], small population size

22   and low density, multiple challenges to survival and reproduction, and damage to habitat from

23   wildfires *warrants concern for the viability of the fisher population in our study area*." *Id.* (emphasis

24   added).

25       During the lead up to the Listing Withdrawal, Service staff members expressed concern with

26   how the Service was interpreting Sweitzer paper's results, and one member suggested that the

27   Service call the article's authors, because "[i]f Sweitzer at al [sic] would not be in agreement with

28   how we are interpreting their findings then we need to alert managers of this." AR 126912. The

leader of the Service's fisher listing team confirmed that the decision not to list the Pacific fisher was relying on Sweitzer's article for the proposition that there is "no definitive information to demonstrate that Southern Sierra population is in decline." AR 126909. She also confirmed there was no effort to ask the authors whether their study would support a withdrawal of the rule. AR 126911. "Did we call the authors and ask them if they would 'be in agreement with how we are interpreting their findings[?]' NO." *Id.* Despite concerns that the authors may disagree that their paper supported the Listing Withdrawal, the Service never did consult them.

The Service also cited a 2013 study of fisher occupancy by William Zielinski for the Southern Sierra. AR 000718. But the Service's Final Species Report acknowledges that this study "must be considered inconclusive" due to small sample size and short duration, and that in general studies of fisher occupancy (whether individuals are present in a given area) may underestimate population declines. AR 022647–48; *see also* J. Tucker, 2013, at AR 025470 (explaining that large declines in abundance result in only small declines in occupancy); AR 178928–29 (peer review explaining that the Sierra Nevada occupancy study "only detects some kind of fisher activity"). This potential underestimation is possible because, for example, even if occupancy remains "stable" in an area, the population may be declining due to lack of reproduction. The study's author provided peer review on the Draft Species Report and proposed rule, and made no mention of his 2013 study as providing any basis for withdrawing the proposed rule. Instead, he praised the Service's proposal to list the Pacific fisher as threatened, finding it "important[]" that the Service had used a precautionary approach to listing, by recognizing "that small and otherwise vulnerable populations of fishers may be at risk." AR 179182.

For the North Coast population, the Service relied on two main studies of population growth, one on the Hoopa Reservation and one in the Eastern Klamath, to conclude that the North Coast population is "essentially stable." AR 000729. But in fact, the Hoopa Reservation study found that fisher density *declined dramatically*—by 73%—between 1998–2004, and that the population had not recovered from the decline. AR 012929. The study found that between 2004–2013, female fishers increased slightly while male fishers likely decreased. AR 012951-53. The study concluded that the decline in male fishers was a "disturbing trend" and that it was likely due to poisoning from

1    anticoagulant rodenticides, a problem the authors concluded may be "growing in severity."

2    AR 012957-59. The study authors moreover warned that "[t]imber management, fuels reduction, and

3    other habitat modifications coupled with climate change *continue to threaten the long-term*

4    *persistence of fisher populations in the Pacific states*." AR 012961 (emphasis added).

5            The Eastern Klamath study, meanwhile, evaluated the effect of removing nine breeding

6    fishers from a small area. AR 024837. It estimated the population growth rate at 1.06, concluding

7    that the population was stable between 2006–2011. AR 024865–66. But the Service's Final Species

8    Report notes that the study had a 95% confidence interval of .97–1.15, meaning it is possible that the

9    population is declining. AR 022641. And the study itself noted that it is possible "that the effects of

10   removing breeding age adults will not be realized immediately, as factors such as dispersal and

11   recruitment may be affected further in the future." AR 024866.

12           Not only were the results of the both the Hoopa and Eastern Klamath studies inconclusive in

13   their own right, but both studies sampled very small areas—only .62% of fisher habitat. AR 022641.

14   The Service's Final Species Report therefore concludes—in marked contrast to the Listing

15   Withdrawal—that "[g]iven the small portion of the North Coast population sampled by the two study

16   areas . . . *it is difficult to determine whether the North Coast population as a whole is increasing,*

17   *decreasing, or stable*." AR 022641 (emphasis added).

18           Thus, at best the evidence before the Service showed inconclusive trends in population

19   growth in very small sample areas of Pacific fisher populations, a far cry from scientific evidence

20   demonstrating "basically stable" populations overall. This case is therefore similar to *Tucson*

21   *Herpetological Society*, where the Ninth Circuit rejected the Service's conclusion that flat-tailed

22   horned lizard populations were persisting, when the conclusion rested on "limited and inconclusive"

23   studies. 566 F.3d at 878. The Court observed that only one study used sufficiently accurate

24   methodology to study populations, and that the study's conclusion that there was no evidence of a

25   large decline in population for the study area could not form the basis for the Service's "sweeping

26   conclusion that viable lizard populations persist throughout most of the species' current range." *Id.* at

27   879. Similarly here, the Service's conclusion that populations are "basically stable" cannot be

28   derived from limited studies showing unclear trends in population growth.

1   This case is also analogous to *Defenders of Wildlife v. Babbitt*, 958 F. Supp. at 682, which

2   held that that the Service's conclusion that a lynx population had increased and therefore was not in

3   need of listing was counter to the study relied upon, which had concluded that the lynx was "in

4   serious trouble" because the animals "have shown dramatic declines with no associated increases on

5   the expected 10 year scale." The Service's decision not to list the Pacific fisher on the basis of

6   scientific studies which themselves expressed concern for the ongoing viability of the Pacific fisher

7   was similarly arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (agency

8   decisionmaking is arbitrary and capricious when the agency has "offered an explanation for its

9   decision that runs counter to the evidence before the agency"). Here, as in both the lynx and the

10  horned-lizard cases, the demographic studies that the Service cited as evidence that populations are

11  "basically stable" simply do not support that assertion.

12           **2.     The Lack of Definitive Evidence that Populations Are Currently Declining Does Not Provide a Rational Basis for Dismissing Well-
13                  Documented Threats.**

14       As discussed above, the Service's conclusion that Pacific fisher populations are stable runs

15  counter to the scientific evidence before it. And the absence of "definitive" evidence proving that

16  fisher populations are currently still declining does not provide a rational basis for the Service's

17  decision, because this conclusion unlawfully ignores (1) the inherent risks of small populations; and

18  (2) the impact of multiple threats that are expected to have an increasing impact on fishers in the

19  foreseeable future.

20       The Service admits that the "greatest long-term risk" to the Pacific fisher is small population

21  size and isolation. AR 022734–35. This risk exists regardless of whether fisher populations are

22  currently declining or stable. The Service's disregard for this risk puts this case on all fours with

23  *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975. At around the same time that the Service's

24  Pacific Southwest team was evaluating whether to list the Pacific fisher, the agency was also

25  evaluating whether to list the North American wolverine. Just like with the Pacific fisher, the Service

26  initially issued a proposed rule finding that the wolverine warranted listing as threatened in part

27  because of its small population size. And just like with the Pacific fisher, the Service abruptly

28  reversed course, concluding that "the factors affecting [the wolverine population] identified in the

1   proposed rule are not as significant as believed at the time of the proposed rule's publication." *Id.* at

2   995. Just like here, the Service "brushed the small population size/low genetic diversity issue aside

3   by concluding that . . . there have been no observed adverse effects as a result of the lack of

4   diversity[.]" *Id.* at 1006.

5          The *Defenders of Wildlife v. Jewell* court rejected the Service's withdrawal of its proposal to

6   list the wolverine as arbitrary and capricious, finding that the Service "erred by not considering small

7   population size and lack of genetic diversity as a tandem independent threat to the wolverine." *Id.* at

8   1005. The court explained that the Service failed to articulate how its own dire observations of the

9   risk of the wolverine's small population sizes did not "themselves constitute adverse effects" and

10  rejected the Service's conclusion that the wolverine was not threatened simply because "there was

11  no data confirming a threat." *Id.* at 1006. For the same reasons, this Court should reject the Service's

12  notion that the Pacific fisher is not threatened because the Service lacks data showing declines in the

13  population, when all of the best available science shows that the fact that the populations are small

14  and isolated is itself the "greatest" threat. AR 022731.

15         Focusing myopically on the lack of "operative" threats—by suggesting that there was no

16  population data confirming a threat—the Service also improperly ignored the ESA's mandate to list

17  the Pacific fisher as threatened if threats are likely to cause population declines *within the*

18  *foreseeable future.* 16 U.S.C. § 1532 (20). The Service therefore "entirely failed to consider an

19  important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

20         Nowhere in the ESA is there a requirement that the Service wait for definitive evidence that a

21  stressor is causing immediate population decline. Instead, the ESA specifically instructs the Service

22  to be forward looking, and evaluate the threats on the species in *the foreseeable future.* 16 U.S.C.

23  § 1532 (20); *see also, e.g., Or. Nat. Res. Council v. Daley*, 6 F. Supp. 2d 1139, 1151 (D. Or. 1998)

24  (rejecting agency decision not to list the coho salmon because it would not become endangered

25  within the next two years as ignoring "foreseeable future" requirement). Indeed, the Service has a

26  duty under the ESA not to wait until the last moment to protect a threatened species, but rather to

27  "take action at the earliest possible, defensible point in time to protect against the loss of biodiversity

28  within our reach as a nation." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d at 1011 (holding that

the Service erred in determining not to list the North American wolverine until the agency saw

evidence of further population declines); *see also Defenders of Wildlife v. Babbitt*, 958 F. Supp. at

680 ("Congress repeatedly explained that it intended to require the [Service] to take preventive

measures *before* a species is conclusively headed for extinction").

But here, the Service largely ignored the evidence of significant threats to the Pacific fisher

in the foreseeable future by focusing on the lack of clear evidence of present declines. Namely, the

Service improperly discounted the conclusions of its Final Species Report that climate change and

high-severity fires pose a risk to the Pacific fisher that "is likely to increase in the future," AR

022669, and that exposure to anticoagulant rodenticides "may result in significant population-level

impacts in the near future," AR 022755. These looming threats on small, isolated fisher populations

were what caused the Service, for more than a decade, to repeatedly conclude that the Pacific fisher

should be listed as threatened. *See, e.g.,* AR 000677; AR 000030; AR 000006. None of these threats

has abated. The Service's dismissal of threats it knows are likely to have an impact in the foreseeable

future, on the grounds that they have not yet had an impact, was arbitrary and capricious and

contrary to the best available science.

## CONCLUSION

It would be the definition of arbitrary and capricious decisionmaking to look at a person

clinging to the edge of a cliff and declare that that they were not in need of saving because they had

yet to fall. But that is precisely the approach the Service has taken with the Pacific fisher.

Recognizing that the Pacific fisher's remaining native populations are already dangerously small,

and that well-documented threats will only increase in the future, the Service nevertheless declared

the species unworthy of ESA protections because it had no unequivocal evidence the fragile

populations are currently declining. This reckless approach to species protection is not countenanced

by the ESA, and should be rejected by this Court. Plaintiffs respectfully request that the Court step

in, for the third time, to uphold the protections afforded to the Pacific fisher by the ESA, and order

the Service to prepare a new rule within 90 days that is based "solely" on the "best scientific and

commercial data available." 16 U.S.C. § 1533(b)(1)(A).

1

Respectfully submitted,

2

GREGORY C. LOARIE (CA Bar No. 215859)
3   EARTHJUSTICE
50 California Street, Suite 500
4   San Francisco, CA 94111
Tel: (415) 217-2000
5   Fax: (415) 217-2040
E-mail: gloarie@earthjustice.org
6

7   Dated: November 3, 2017       /s/ Elizabeth B. Forsyth
ELIZABETH B. FORSYTH (CA Bar No. 288311)
8   EARTHJUSTICE
800 Wilshire Blvd., Suite 1000
9   Los Angeles, CA 90017
Tel: (415) 217-2000
10   Fax: (415) 217-2040
E-mail: eforsyth@earthjustice.org
11

*Counsel for Plaintiffs*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Attachment A**

2

3

4

5

6

7

8

9

10

11

12



13

14
Photo of Pacific Fisher. Photo Credit: Nick Nichols, National Geographic. AR 022606.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Attachment B**

2

3

Figure 1—West Coast DPS of fisher[1] (historical range and boundary as outlined in the 2004 finding and 2014 proposed listing rule).

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Map of Pacific fisher historical range and population detections. AR 000714.

26

27

28